UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
NORTHERN DIVISION

| | |
|---|---|
| IN RE:<br><br>BP PROPANE INDIRECT PURCHASER ANTITRUST LITIGATION<br>______________________________<br>This Document Relates To:<br><br>All Indirect Purchaser Actions | Master File No. 06-CV-3541<br>The Honorable James B. Zagel<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED COMPLAINT AND DEMAND FOR TRIAL BY JURY**

Plaintiffs complain of defendants, upon information (*see* ¶ 4(f)) and belief (except as to ¶ 9 which are based on personal knowledge), as follows:

## I. SUMMARY OF ALLEGATIONS

1. In the United States, energy commodities are used for heating, transportation and other needs. The United States is increasingly dependent for its energy commodities on an increasingly small number of increasingly large and profitable energy companies. These companies include British Petroleum, its U.S. subsidiary, Defendant BP America, Inc. and other subsidiaries of BP America, Inc. ("Defendants" or "BP Defendants" or "BP").

2. One such energy commodity is propane, $C_3H_8$. *See* ¶¶ 15, 25 *infra*. Approximately 6.8 million American homes depend on propane as the specific form of energy they use for home-heating. **The BP Defendants are the largest supplier in the U.S. of propane**. Propane is used not only as a source of energy but also for the other purposes alleged in ¶¶ 16-17.

3. Unlawful Conduct. During the winter of 2004, the BP Defendants (as defined in ¶ 12) artificially inflated and manipulated the prices of propane used in the States alleged in ¶ 152 *infra.* Defendants' deceptions and manipulative restraints of trade violated the laws of such States and focused on a common carrier pipeline that is affected with a public interest and was created with eminent domain powers and other aid of the laws of the States alleged in ¶ 18.

4. Criminal Actions.

a. On October 25, 2007, the United States Department of Justice charged BP America, Inc. with knowingly and willingly conspiring and agreeing to (a) manipulate and attempt to manipulate the price of February 2004 TET propane (as defined in ¶ 20 *infra*) and to corner and attempt to corner the market for February 2004 TET propane; (b) to devise a scheme and artifice to defraud purchasers of February 2004 TET propane at a price set by the Oil Price Information Service ("OPIS") index; and (c) to obtain money and property by means of materially false pretenses, representations and promises, and to utilize the United States mails, private and commercial interstate carriers, and interstate wire communications for the purpose of executing that scheme and artifice. *United States v. BP America Inc*, 07-CR-683 (N.D. Il. 2007), filed October 25, 2007 (hereinafter "BP America Information").

b. On the same date, BP America, Inc. ("BP America") waived indictment on such charges and entered into a Deferred Prosecution Agreement with the United States Justice Department. *United States v. BP America, Inc.*, No. 07-CR-683 (N.D. Il. 2007), Deferred Prosecution Agreement, filed October 25, 2007, and Attachment A thereto titled "Statement of Facts")(hereinafter "DPA"). This agreement applies to BP America and its following subsidiaries: BP Corporation North America, Inc., BP Products North America, Inc., BP America Production Company, BP Energy Company and BP International Services Company.

c. Defendant BP America admitted and agreed that the allegations in the criminal case regarding certain acts of current and former officers and employees of Defendant BP America and its subsidiaries, including Defendant BP America Production and Defendant BP International, are accurate. *See* DPA, annexed as Ex. A hereto, ¶ 3 and Attachment A thereto, ¶ 1.

d. Also on October 25, 2007, the United States Department of Justice indicted BP America (former) employees Mark D. Radley ("Radley"), James W. Summers ("Summers"), Cody D. Claborn ("Claborn") and Carrie Kienenberger ("Kienenberger") for conspiracy pursuant to 18 U.S.C. § 371; for market cornering and commodity price manipulation pursuant to 7 U.S.C. § 13(a)(2) and 18 U.S.C. § 2; and wire fraud pursuant to 18 U.S.C. §§ 1343 and 2. *United States v. Mark D. Radley, James W. Summers, Cody D. Claborn and Carrie Kienenberger*, 07-CR-689 (N.D. Il. 2007), filed October 25, 2007 (hereinafter "2007 Indictment").

e. On June 28, 2006, the United States Department of Justice charged Dennis Abbott with one count of conspiracy pursuant to 18 U.S.C. § 371. *United States v. Abbott*, 06-CR-189 (D.C. 2006), filed June 28, 2006 (hereinafter "Abbott Information").

f. Plaintiffs' information is based on the investigation of counsel which includes extensive facts alleged in the foregoing criminal actions against BP America or various Defendants' employees.

5. <u>Actual Damages</u>. As a proximate and foreseeable result of Defendants' extensive unlawful conduct, Defendants caused the prices paid for propane by Plaintiffs and Class members in the States alleged in ¶ 152 to be substantially and artificially higher than they would have been in the absence of Defendants' unlawful conduct. Indeed, Defendants' violative conduct was so extensive that it caused the prices of TET propane (as defined in ¶ 20) to be as

much as 1.5 (*see* ¶ 49) times as high as they would have been in the absence of Defendants' unlawful conduct.

6. Punitive Damages. In all the circumstances, Defendants' extensive unlawful conduct constitutes aggravated misconduct that is morally reprehensible.

a. A consideration relating to punitive damages is that the U.S. homes and farms that depend on propane for their winter heating needs tend to be in areas that are not serviced by or cannot afford natural gas or other energy sources. Because these homes are structurally set up to use only propane for heating, they had, as Defendants well knew, a so-called "inelastic" demand for propane. That is, they **had** to pay the artificially inflated prices that Defendants caused.

b. The BP Defendants expressed in their internal memoranda and conduct no remorse or concern for the persons who paid the artificially inflated prices that BP caused.

c. On the contrary, BP expressly undertook its artifices and manipulation in order, in its own words, to learn how "to control the market at will." *See* transcript of taped conversation between Defendants' officers, Mark Radley and Dennis Abbott, on February 5, 2004:

> Radley: So I think the minimum level [of propane that Defendants had to control, to be able to greatly inflate prices] might be a little higher than we're assuming based on what we experienced in April [2003] **when we squeezed the April/May**
>
> Abbott: Right ….
>
> ****
>
> Radley: …. in terms of whether we should do this or not in terms of talking to Jim [Summers] . . . what we stand to gain is not just we'd make money out of it, but **we would know from thereafter that we could control the market at will**. If we never break the threshold [of the market's ability to withstand a manipulation], we'll never know what the answer is . . .
>
> * * * *
>
> Radley: ….You know, **the payoff isn't just this year. It's paying for as long as we carry on trading.**

[Emphasis supplied.]

d. In a post-mortem anatomy of its manipulation entitled "Lessons Learned" (*see* ¶ 139), BP sought to teach its traders and supervisors in propane and other energy commodities precisely what would and what would not enable them to "control the market at will." *Id*.

e. Thus, Defendants' unlawful conduct alleged in ¶¶ 3 and 4 constitutes aggravated and morally reprehensible conduct in violation of the most fundamental laws and public policies of the States alleged in ¶ 152.

f. Among other things: (1) Defendants are the largest company supplying U.S. energy needs in propane; (2) Defendants manipulated and artificially inflated the price of this energy commodity during the Winter when it was being used in those States for heating; (3) Defendants did so precisely in order to learn how to systematically inflate the price of that source of energy every Winter and control the market at will; and (4) Defendants did so by focusing on the prices of propane carried through a pipeline affected with a public interest.

g. Accordingly, an award of punitive and exemplary damages is alleged herein to be appropriate under the laws of the States alleged in ¶ 152 (except for Arkansas, Connecticut, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, New Jersey, New York, Ohio, Tennessee and any other State as to which punitive damages would impair class action treatment). This will discourage Defendants and other energy companies from repeating such aggravated, morally reprehensible conduct. This will deter Defendants and other energy companies from seeking to perfect how to violate each such State's laws on a systematic basis and to artificially inflate energy prices at sensitive times.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interests

and costs, and which some members of the proposed class are citizens of a different State than BP.

8. Venue is proper pursuant to 28 U.S.C. § 1391(a) because Defendants reside in the State of Illinois, and have purposely availed themselves of the laws of the State of Illinois, and are subject to personal jurisdiction in this District. Also, a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III. PARTIES

9. Plaintiffs:

a. Plaintiff Richard Dennison ("Dennison") is a resident of New York. During the Class Period, Dennison purchased propane.

b. Plaintiff Stephen Hesano ("Hesano") is a resident of Michigan. During the Class Period, Hesano purchased propane.

c. Plaintiff Michael Withum ("Withum") is a resident of Vermont. During the Class Period, Withum purchased propane.

d. Plaintiff Gregory Sydor ("Sydor") is a resident of Wisconsin. During the Class Period, Sydor purchased propane.

e. Plaintiff Myles Levin ("Levin") is a resident of Illinois. During the Class Period, Levin purchased propane.

f. Plaintiff Parke J. Patten, Inc., d/b/a Patten Inc. or Patten's Gas ("Patten") is a resident of New Hampshire. During the Class Period, Patten purchased propane.

g. Plaintiff Gateway FS, Inc. ("Gateway FS") is a resident of Illinois. During the Class Period, Gateway FS purchased propane.

h. Plaintiff Scott Meharg ("Meharg") is a resident of North Carolina. During the Class Period, Meharg purchased propane.

i. Plaintiff James Marcello ("Marcello") is a resident of New York. During the Class Period, Marcello purchased propane.

j. Plaintiff Drew Halpern ("Halpern") is a resident of Florida. During the Class Period, Halpern purchased propane.

k. Plaintiff Donald Mowers ("Mowers") is a resident of New York. During the Class Period, Mowers purchased propane.

l. Plaintiff Kurt Nebel ("Nebel") is a resident of New York. During the Class Period, Nebel purchased propane.

m. Plaintiffs Donald Terry and Jennifer Terry ("Terry") are residents of West Virginia. During the Class Period, Terry purchased propane.

n. Plaintiff H. Steven Plaut ("Plaut") is a resident of Kentucky. During the Class Period, Plaut purchased propane.

o. Plaintiff David A. Mullins III ("Mullins") is a resident of Kentucky. During the Class Period, Mullins purchased propane.

p. Plaintiff David Guin ("Guin") is a resident of Alabama. During the Class Period, Guin purchased propane.

## Defendants

10. BP plc is a major international energy company headquartered in London, England, and organized as a private limited company under the laws of England and Wales, the shares of which are traded on the London Stock Exchange and the New York Stock Exchange.

11. Within and across the corporate structure of BP, there were a number of groups, business units and teams that focused on specific aspects of the companies' business. These groups and business units were not separate legal entities but rather existed within and across the various BP legal entities. The regional business unit responsible for the trading of gas and power products, including propane, in North America was North America Gas & Power ("NAGP"). During 2003 and 2004, the team within NAGP focused on trading of natural gas liquids, including propane, was known as the NGL trading bench ("NGL Trading Bench"). The NGL Trading Bench bought and sold propane in the name of BP. The regional business unit responsible for the production, transportation and sales of natural gas liquids, including propane, in North America was the Natural Gas Liquids Business Unit ("NGLBU").

12. Defendant BP America, Inc. is a wholly owned subsidiary of BP plc. BP America is a holding company incorporated under the laws of Delaware, and maintains its principal place of business at 28100 Torch Parkway, Warrenville, Illinois.

a. Defendant BP Products North America Inc. ("BP Products") is a wholly-owned subsidiary of BP America. BP Products maintains its principal place of business at 28100 Torch Parkway, Warrenville, Illinois.

b. Defendant BP Corporation North America Inc. ("BP Corporation") is a subsidiary of BP America.

c. Defendant BP America Production Company ("BP America Production") is an indirect subsidiary of BP America. Dennis Abbott, Mark Radley, Cody Claborn, Carrie Kienenberger, Tim Morby, James Summers and Martin Marz were employees of BP America Production during the relevant period.

d. Defendant BP Energy Company ("BP Energy") is a subsidiary of BP America.

e. Defendant BP International Services Company ("BP International") is a subsidiary of BP America. Donald Byers and Tim Bullock were employees of BP International during the relevant period.

f. Defendants BP America, BP Corporation, BP Products, BP America Production, BP Energy and BP International are collectively referred to herein as the Defendants or BP Defendants or BP.

13. During February 2004, the NGL Trading Bench was located in Houston, Texas, and employed approximately eight traders. All of the members of the NGL Trading Bench were employees of BP America Production, reporting to managers and other executives who were employed by other BP America subsidiaries. The NGL Trading Bench entered into contracts to purchase and sell propane on behalf of BP Products. [Source: DPA ¶ 15.]

14. The non-Defendant employees of the BP Defendants during the relevant period were as follows:

a. Tim Bullock ("Bullock") was the Chief Executive Officer or Business Unit Leader of NAGP. [Source: DPA ¶ 26.]

b. Donald Cameron Byers ("Byers") was the Chief Operating Officer of NAGP in both April 2003 and February 2004. Byers was responsible for, among other things, the development, implementation, and execution of trading and marketing strategies for NAGP. Byers was also responsible for the oversight for the NAGP's risk management and for ensuring that appropriate trading processes, systems and controls were in place. [Source: DPA ¶ 25.]

c. James W. Summers ("Summers"), in or about February 2004, was a Vice President of Natural Gas Liquids Trading and Marketing and the supervisor of BP Bench Leader

Mark Radley. Summers had supervisory responsibilities for the trading activities of the NGL Trading Bench and approving trading strategies. [Source: DPA ¶ 24; 2007 Indictment ¶ 7.]

d. Martin Marz ("Marz"), during the relevant period, was the Compliance Manager for NAGP. Marz was responsible for ensuring that the NAGP was complying with all appropriate rules and regulations, including laws, trading ethics, and company policies regarding the manipulation of prices.

e. Mark D. Radley ("Radley"), during the relevant period, was the bench leader and manager, and the direct supervisor of the traders on the NGL Trading Bench ("BP Bench Leader"). As the BP Bench Leader, Radley's responsibilities included the development and oversight of trading strategies. Radley was responsible for the management of "all aspects of the day-to-day trading activities" of the NGL Trading Bench. Radley was also responsible for monitoring and enforcing "compliance with all internal assurance and controls, as well as external regulations and securities laws." Radley reported to Summers. [Source: DPA ¶ 23, 24; 2007 Indictment ¶ 7.]

f. Cody D. Claborn ("Claborn") was the primary trader on the NGL Trading Bench responsible for trading TET propane from at least January 2003 to April 2005. [Source: DPA ¶ 19; 2007 Indictment ¶ 8.]

g. Dennis N. Abbott ("Abbott") was a trader on the NGL Trading Bench during 2003 and 2004, among other times. During 2004, Abbott traded primarily butane and, as the need arose, propane and other commodities. [Source: DPA ¶ 20; Abbott Information ¶ 14(a).]

h. Carrie Kienenberger ("Kienenberger") was a trader on the NGL Trading Bench primarily responsible for trading ethane and other NGLs, as well as propane, during 2003 and

2004. During February 2004, Kienenberger assisted with the trading of TET propane and aided in the execution of the manipulation scheme. [Source: DPA ¶ 21; 2007 Indictment ¶ 9.]

i. Tim Morby ("Morby") was a trader on the NGL Trading Bench primarily responsible for trading other categories of propane during 2003 and 2004, but also traded TET propane during February 2004. [Source: DPA ¶ 22; 2007 Indictment ¶ 12.]

j. During the relevant period, employees Abbott, Claborn, Kienenberger and Morby traded TET propane on behalf of BP and at Radley's direction. The conspirators are Radley, Summers, Claborn, Kienenberger, Abbott and BP Trader # 4 [Morby]. [Source: 2007 Indictment ¶¶ 7-12.]

k. In the Deferred Prosecution Agreement that Defendant BP America entered reference is made to "BP Trader # 1", who is Claborn; "BP Trader # 2", who is Kienenberger; "BP Trader # 3", who is Morby; "BP Bench Leader", who is Radley; "BP Executive # 1", who is Summers; "BP Executive # 2", who is Byers; "BP Executive # 3", who is Bullock; and "BP Compliance Manage for NAGP", who is Marz. [Source: DPA ¶¶ 19, 21 – 27.][1]

## IV. SUBSTANTIVE ALLEGATIONS

### A. Propane And The Significance Of The TET Market

15. Propane is a natural gas liquid ("NGL") which is created as a by-product of (a) refining petroleum, or (b) separating natural gas produced by so-called natural gas wells from the associated gases that are also produced by such wells, *e.g.*, propane, butane and other gases. Because propane is a by-product of these two processes, the volume of propane available from

[1] In the 2007 Indictment, Morby is referred to as "BP Trader #4" [Source: 2007 Indictment ¶ 12]; in the Abbott Information and the 2007 Information, Summers is referred to as "BP Employee # 4" and "the BP executive" [Sources: Abbott Information ¶ 15(c); BP America Information ¶ 6(b); *see* 2007 Indictment ¶ 30].

these sources will not necessarily adjust immediately to changes in the supply and demand of propane. As used in this complaint, "propane" includes the organic compound, propylene, which is closely related to propane.

16. In the winter in the United States, propane is used predominantly as a fuel that is burned to heat homes, businesses, mobile homes, or agricultural or other structures and to operate motors for vehicles and machines that dry crops, control pests or perform other functions. Propane is also extensively used as a component in the production of plastics by the petrochemical industry.

17. Propane is the fourth most important source of residential heating in the United States. By 2003, approximately 6.8 million households used propane as their primary heating fuel. Propane is most commonly used to provide energy in areas not serviced by natural gas distribution systems, *i.e.*, propane is commonly used in rural regions.

18. In the eastern one-half of the United States, propane is distributed from the propane producing areas in and around Texas to the propane consuming areas largely by pipelines. These include the Texas Eastern Products Pipeline Co., LLC ("TEPPCO") pipeline which originates in Texas and runs to Ohio where it splits in two with one line running west to Illinois and the other east to New York and New England. The States through which the TEPPCO pipeline runs are Texas, Arkansas, Louisiana, Missouri, Illinois, Indiana, Ohio, Pennsylvania and New York.

19. Propane deliverable anywhere in this pipeline or at the TEPPCO pipeline storage facility in Mont Belvieu, Texas is referred to as TET propane. The TEPPCO storage facility is the primary source for propane used in residential, commercial, and agricultural heating in the Northeastern and upper Midwest United States *via* the TEPPCO pipeline. The TEPPCO pipeline

is the only pipeline that transports propane from Mont Belvieu to the Northeast and Midwest regions of the United States.

20. Only propane within the TEPPCO system (comprised of its storage cavern and its pipeline) is TET propane. At any given time, the total TEPPCO system inventory of propane represents the total available supply of TET propane.

21. The flow of propane within the TEPPCO pipeline is unidirectional, transporting propane from Mont Belvieu, Texas "upstream" until the propane is off-loaded at any point or reaches the terminus in Ohio, and is then directed into the western branch of the pipeline running towards Illinois or the eastern branch running towards New York. Once propane has left the TEPPCO storage facility and enters the pipeline, the propane cannot be moved back into the TEPPCO storage facility *via* the pipeline.

22. Prices of TET propane affect the price of propane purchased by consumers, including residential consumers in Illinois.

23. Inventories in TET propane are generally built up during the spring and summer months and typically peak by the end of September or October. During the winter heating season, TET propane inventory withdrawals occur. TET propane inventories are typically declining steadily towards the end of the home heating season in February and March.

24. Because propane is a heating fuel, demand from the residential and commercial markets tends to be inelastic, or price insensitive. When prices for propane increase quickly, consumers of propane in the residential/commercial sector are generally unable to switch to other fuel sources for heating. Therefore, they must either pay the price being offered to them or forego using propane as a source of heating.

25. Although all propane is $C_3H_8$ (three carbon atoms and eight hydrogen atoms), TET propane is a type of propane recognized as being distinct from other types of propane by the propane industry. The market for TET propane is distinct from markets for other types of propane. The propane industry recognizes that TET propane has its own market price distinct from the prices for other types of propane; however, TET propane prices serve as a "price beacon" for other propane prices. *See* ¶ 29 *infra*.

26. Aside from TEPPCO, Mont Belvieu has other individual, privately owned storage caverns. Also located in Mont Belvieu are storage facilities owned and operated by Enterprise Products Partners, LP and, during the relevant period, Dynegy Liquids Marketing and Trading, LP. As previously alleged, propane in the TEPPCO storage facility is identified as "TET" propane by the propane industry. By comparison, propane in other storage facilities at Mont Belvieu is designated as "non-TET" propane by the propane industry.

27. Propane prices in the areas serviced by or near the TEPPCO pipeline area are determined largely by the TET propane market prices. As the TET propane market prices go up, the prices paid for "downstream" propane purchased by plaintiffs and other Class members, goes up as well. This is true for many reasons.

28. TET propane market price increases are passed on by the direct purchasers of TET propane to the commercial, home or other end consumers in the States alleged in ¶ 152. The amount of inflation passed on by the direct purchasers of TET propane may be greater than one cent per gallon for each one cent per gallon increase in TET propane prices. This is because of the direct purchasers' markups over and above their costs.

29. Also, there is an active market in purchasing and selling physical propane, and financial contracts related to that physical propane, delivered over a pipeline. *See* ¶ 37 *infra*. By

far, the TET propane market is the most actively traded physical and financial propane market in the United States. Because the TET propane market is the most actively traded market, the TET propane market price serves as a “price beacon” for propane purchasers and sellers in the United States. Therefore, as TET propane prices rise, other propane prices tend to rise.

30. Implicitly admitting as much, BP, in its settlement of the United States’ criminal charges, agreed to establish a fund to compensate persons who paid artificially high prices for propane or were otherwise injured by Defendants’ conduct. *See* ¶ 4(c).

31. There is an especially close relationship between the price of TET market propane and that of non-TET propane, especially non-TET propane transported by the Dixie Pipeline Company. The Dixie pipeline runs from Texas to North Carolina and Georgia. The Northeastern States and the South Atlantic States are each served by a different pipeline: TEPPCO for the North and Dixie for the South.

**B. Propane Trading**

32. Producers, marketers and consumers of propane trade propane contracts in a variety of ways, including propane futures contracts on the New York Mercantile Exchange ("NYMEX") and other types of contracts in the over-the-counter ("OTC") market.

33. In the OTC market, propane is traded through direct, bilateral transactions between counterparties, through voicebrokers, and on an electronic facility known as "Chalkboard." Voicebrokers generally do not take title to propane and serve primarily to negotiate and execute deals between willing buyers and willing sellers. Similarly, Chalkboard allows parties to post bids and offers and then execute transactions in propane. Chalkboard also does not take title to propane.

34. Prices of TET propane affect the price of the NYMEX futures contract for propane, in part, because the NYMEX propane contract provides for delivery of propane at TEPPCO.

35. In the OTC market, propane trades are generally in lots of 1000 barrels ("bbls"). Each barrel is the equivalent of 42 gallons of propane. Prices for propane trades or contracts are quoted, negotiated and executed in 1/8th cent per gallon ("cpg") increments.

36. OPIS publishes a daily newsletter which includes, among other things, market commentary and a daily index of prices for both TET propane and non-TET propane. The prices published by OPIS include a daily low, a daily high and a simple average of these two prices which is known as the "OPIS average." The propane industry uses OPIS as a source for determining the price at which they buy and sell TET propane.

37. In the OTC market, propane trades may either be settled through physical delivery or settled financially, *i.e.*, money is exchanged between the parties based on TET propane or other prices.

38. Propane trades in the OTC market may also be designated as "any" or "wet." A transaction involving "any" propane calls for delivery of the propane at any time during the contract month up until the last day of the contract month.

39. A transaction involving "wet" propane requires delivery of the propane on a specific date within the contract month.

**C. BP's Corporate Structure and Business in Propane**

40. BP is a producer, marketer and consumer of commercial propane in the United States. BP's production, transportation and retail sales of commercial propane are handled by BP's NGLBU. *See* ¶ 11 *infra*.

41. According to BP's website, it is the "#1 supplier of NGLs (*see* ¶ 15) in North America, marketing over 500,000 barrels per day of liquids including propane and butane." BP's trading of propane is handled by BP's NAGP as defined in ¶ 11. During the relevant period, all relevant individuals were employed with BP's NAGP.

42. Consistent with industry practice, during the relevant period, BP recorded the Trading Bench members' telephonic communications. BP traders were aware that their conversations were recorded.

**D. Defendants' Confession of Criminal Conduct, Specific Factual Admissions And Other Allegations of Wrong-Doing**

43. BP admits that through the actions of its employees, BP conspired to corner the market and manipulate the price of February 2004 TET propane contrary to Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), and engage in transactions that violated 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), all in violation of 18 U.S.C. § 371. [Source: DPA ¶ 73.]

44. In the Deferred Prosecution Agreement, Defendant BP America "admit[ed], accept[ed] and acknowledge[d]" responsibility for certain acts of its current and former officers and employees of its subsidiaries, including Defendant BP America Production and Defendant BP International, which Defendant BP America "agree[d]" were "accurate." [Source: DPA ¶ 3.] Those facts are alleged virtually[2] verbatim between ¶¶ 45 - 141 below.

45. From February 5, 2004, through March 12, 2004, employees of the subsidiaries of BP America including, BP America Production and BP International (hereinafter collectively referred to as the "BP Entities") (BP America and the BP Entities will hereinafter be referred to

[2] A significant change is that, where the DPA provided "BP Trader #1" or another term to avoid using the actual name, Plaintiffs have alleged the actual name in brackets in the allegations of this complaint.

collectively as “BP”) conspired to manipulate the February 2004 propane market for propane transported in the TEPPCO pipeline system (hereinafter referred to as “TET” propane). As a result, the price of TET propane was artificial and inflated from February 12, 2004 through March 2, 2004. [Source: DPA ¶ 1.]

46. In accordance with the plan, the employees used the financial resources of BP to buy contracts for substantially all of the February 2004 TET propane supply to become the dominant owner, or “long-holder,” of TET propane. A company is "long" if its overall obligation to buy and receive propane is greater than its obligation to sell and deliver propane. The employees, at specific times thereafter, withheld supply from the market while continuing to purchase contracts to own more than the supply of TET propane in the TEPPCO system. BP’s dominant ownership position, continued purchases of said propane subsequent to obtaining such a position, and withholding of supply at specific times thereafter, all distorted and made artificial the price of TET propane during February 2004. As a result of the employees’ conduct, by the end of February 2004, BP acquired ownership of substantially all of the available supply of February 2004 TET propane in the United States. The employees executing the plan thus cornered the market for February 2004 TET propane, and sold a portion of the supply at an artificial and inflated price. [Source: DPA ¶ 2.]

47. Effects Of Unlawful Conduct: Causing The Prices of TET Propane To Be More Than 1.6 Times As High As They Should Have Been. Propane prices are typically and should be determined by supply and demand. Demand is directly related to price and supply is inversely related to price, that is, all other things equal (a) the lower the supply of propane, the higher the price may be, and (b) the higher the demand for propane, the higher the price of propane may be.

48. During February 2004:

a. The demand for TET propane (as that term is defined in ¶ 20) unexpectedly decreased substantially due to unseasonably mild weather and, therefore, less usage and need for propane to heat homes in the Midwest and Northeast United States. This lower demand for propane meant that TET propane prices should, all else equal, have declined.

b. The normal seasonal pattern of propane storage is that there is a substantial decline in the amount of propane stored during January and February of each year because they are the time of peak usage for heating. This normal seasonal pattern obtained during January 2004 and the beginning of February 2004 as propane supplies fell substantially. However, the supply of TET propane did **not** decline after February 11, 2004. On the contrary, such supplies increased by approximately 65%. And the total TEPPCO system propane inventory at the end of February 2004 exceeded the five year average system propane inventory by approximately 65%.

c. This greatly increased supply of TET propane meant that, based on the fundamentals, TET prices should, all else equal, have declined substantially and affected U.S. propane users should have enjoyed substantially lower propane prices declining to 55¢ per gallon or less. *See* ¶¶ 82-89, *infra*.

49. But Defendants' fraudulent restraints of trade and unlawful conduct artificially injected manipulative demand into and artificially withdrew supply from the supply-demand equation for TET propane prices. As a result, Defendants deprived class members of any price decrease at all let alone the substantial price decreases that should have occurred. On the contrary, Defendants caused TET propane prices to **increase by almost 50%** over a brief period to a level that was more than 1.5 times as high as TET propane prices should have been absent Defendants' unlawful conduct. *See* ¶¶ 82-89 *infra*.

50. Means of Unlawful Conduct. During February 2004:

a. Defendants were propane producers and sellers who had no need to purchase propane. However, Defendants made agreements with voice brokers to buy all the TET propane for February 2004 delivery that they had available. E.g., ¶¶ 53, 63 *infra*.

b. Defendants intentionally made agreements with brokers and counterparties to purchase more physical TET propane for February 2004 delivery than was available.

c. If Defendants were going to buy unneeded propane, then they had an interest to purchase as cheaply as possible. But Defendants uneconomically refused to purchase propane at attractively available prices unless the counterparty agreed to report a higher price to the market. Defendants engaged in this uneconomic, deceptive conduct in order mislead the propane market.

d. Despite being a propane seller, Defendants purposely withheld supplies.

e. Defendants engaged in tactics to conceal their unlawful conduct, mislead counterparties and the propane market, and caused false information and false, artificially high prices to be publicly and otherwise reported to the market by, among others, the OPIS price index.

- For example, Defendants falsely purported to offer for sale TET propane contracts for February 2004 delivery in order to deceptively lull TET market participants by creating the false impression among them that TET propane for February 2004 delivery was available.

- For another example, Defendants lied to other market participants and stated that Defendants were not engaged in an effort or conspiracy to buy up all the TET propane. *See* ¶¶ 88, 131, *infra*.

- For another example, Defendants posted "high floor" bids, "stacked" multiple offers and bids, stepped-up prices, posted deceptively low "wet" March offers, and withheld supply on each day of the three days settlement price.

f. Defendants, contrary to their entire operating history, took the unprecedented step of making agreements in late February 2004 to "redesignate" 3.8 million barrels of February 2004 TET propane as March 2004 TET propane "wet" barrels. *See* ¶¶ 100-101, *infra*.

g. Defendants specifically intended the agreements alleged in "a," "b" and "f" above to restrain trade and they did restrain trade in the TET propane market by artificially inflating TET propane prices, and enabling Defendants to learn how to manipulate and "control the market at will."

51. Also, Defendants' unlawful conduct enabled (a) Defendant BP Products to sell large amounts of TET propane contracts or holdings at higher prices than they otherwise would have been able to sell; and (b) Defendant BP Products to inflate prices at which it sold the propane that it produced and sold during February and March 2004. These sales at unlawfully and fraudulently inflated prices unjustly enriched and increased the revenues of Defendants.

**E. Defendants Fraudulent Restraints of Trade To Manipulate And Artificially Inflate TET Propane Prices in 2003 and 2004**

**1. 2003 TET Propane Manipulation**

52. The BP Bench Leader [Radley] and members of the NGL Trading Bench conspired to manipulate the price of TET propane during February 2004 based, in part, upon information and experience gained in April and May of 2003 when members of the NGL Trading Bench attempted to manipulate the price of April 2003 TET propane. During April 2003, the NGL Trading Bench attempted to corner April 2003 TET propane by taking a large long position. Through this strategy, the NGL Trading Bench members sought to make money

by purchasing substantially all of the available April TET propane supply, and sought to hold those barrels until the price increased based on the resulting lack of supply and then sell the barrels to market shorts. [Source: DPA ¶ 28.]

53. Going into the month of April 2003, BP Defendants intentionally made agreements in restraint of trade in order to establish a significant long position in April 2003 TET propane and artificially inflate TET propane prices. Defendants continued to make such agreements through April 12, 2003.

54. During a conversation on April 12, 2003, BP trader #1 [Claborn], Abbott and the BP Bench Leader [Radley] stated:

| | |
|---|---|
| Abbott: | **How does it feel taking on the whole market, man**? |
| BP Trader #1: [Claborn] | Whew. It's pretty big man. |
| Abbott: | Dude, you're the entire f[***]ing propane market. |

***

| | |
|---|---|
| BP Bench Leader: [Radley] | Don't worry about it, it's the first two days of the month. Plenty of lead time for people to think that barrels will emerge and take a short position. |
| Abbott: | No, I mean, its cool, **100% of the open interest in propane** probably, and uh 3% of the open interest in nat gas. . . . I dig it, it just, sometimes its hard, **it just feels hard to take on the whole market sometimes**. |

[Emphasis supplied.] [Source: DPA ¶ 29.]

55. Despite their statements that they were "the entire propane market" and "100% of the open interest in propane" on April 2, 2003, BP employees, acting pursuant to Radley's instructions, continued to purchase April 2003 TET propane in significant quantities throughout the month of April 2003. BP employees continued to purchase April 2003 TET propane

throughout the month in an effort to comer the April 2003 TET propane market. Defendants, per Radley, anticipated that after BP cornered the April 2003 TET propane market, BP could force those who were short April 2003 TET propane to buy April 2003 TET propane from BP at high prices dictated by BP.

56. Based on the April 2003 manipulation of the price of TET propane, members of the NGL Trading Bench booked a profit and learned information that they later used during the February 2004 manipulation strategy. In particular, the NGL Trading Bench learned what they believed to be the "dead stock" level of TET propane, or the "minimum operating level" needed for the TEPPCO pipeline to function. The traders' perception of the dead stock level, later coupled with knowledge of the total TEPPCO propane inventory, led the NGL Trading Bench to believe they could estimate the total size of the available physical supply of TET propane, thereby allowing them to estimate the total amount of physical contracts they would have to purchase to corner February 2004 TET propane and effectuate a manipulation. [Source: DPA ¶ 30.]

57. On or about February 5, 2004, the BP Bench Leader [Radley] and Abbott discussed the manipulation or "squeeze" of the price of the April 2003 TET propane and the dead stock information they gleaned from their prior attempt, stating:

| | |
|---|---|
| BP Bench Leader: [Radley] | The second point is, that I would imagine that the minimum operating level at the end of Feb[ruary] is higher than it is at the end of March or April because I think the wholesalers have to hold barrels. So I think the minimum level might be a little higher than we're assuming based on what we experienced in April **when we squeezed the April May**. |
| Abbott: | Right, which was one of the reasons why it was harder to own all that April. That's why we had to take on a little bit more than we thought we had to take on, in April. And that's why I think that 2 mm, 2.1 mm barrels as that |

> minimum in Feb., I think that's real, man, I think that is, that's the bottom at TET.

[Emphasis supplied.] [Source: DPA ¶ 31.]

**2. 2004 Propane Manipulation**

58. During February 2004, members of the NGL Trading Bench developed a plan to manipulate the price of February 2004 TET propane by becoming the dominant owner of February 2004 TET propane. As explained below, the strategy was intended to force other market participants holding short positions in TET propane at the end of February to purchase February 2004 TET propane from BP at an artificial and inflated price. Between approximately February 9, 2004 and February 27, 2004, members of the NGL Trading Bench executed the manipulation scheme by buying almost all of the available February TET supply in the TEPPCO system, withholding that supply during the month, and selling a portion of the supply later in the month, to certain counterparties holding short positions at artificial and inflated prices. [Source: DPA ¶ 32.]

59. Due to BP's conduct, from approximately February 12, 2004, through approximately March 2, 2004, the price of February TET propane was artificial and inflated by BP's conduct. [Source: DPA ¶ 33.]

60. Indeed, during January 2004, the BP Bench Leader [Radley] identified and discussed conditions relating to the TET propane market that would render the market ripe for manipulation. On or about January 8, 2004, during a regularly scheduled call, the BP Bench Leader [Radley] stated to other employees located in Texas, Illinois, and elsewhere that the TET propane market was "vulnerable to a squeeze." [Source: DPA ¶ 34.]

61. In order to squeeze the TET propane market --- that is, corner the supplies and manipulate the prices of TET propane --- Defendants took the steps alleged in ¶¶ 70-102, 114-125, 132-141 below from January 8, 2004 forward.

62. In addition, on or about January 13, 2004, the BP Bench Leader [Radley] stated to another employee that February 2004 TET propane in the short term was "tight enough that if someone wanted to play games with it, potentially they could." The BP Bench Leader [Radley] further stated that if someone wanted "to get a hold of this [TET propane] market and play some games with it" they could. [Source: DPA ¶ 35.]

63. In order to play such "games," Defendants, per Radley, made during January 2004 agreements in restraint of trade to purchase large amounts of February 2004 TET propane.

64. During January 2004 and the beginning of February 2004, the BP Bench Leader [Radley] instructed the NGL Trading Bench to amass a significant position in February TET propane, both contracts for delivery of physical barrels as well as financial or "swap" contracts. By the estimate of BP Executive #1 [Summers], entering February 2004, BP owned contracts for delivery for nearly 50% of all of the available physical February TET propane. [Source: DPA ¶ 37.]

65. Defendants' intention, during January 2004 when this large position was purchased, was to manipulate TET propane prices.

66. During a conversation on or about February 5, 2004, Radley and Abbott also discussed how to seek approval of the scheme from Summers. [Source: 2007 Indictment ¶ 29.]

67. This conduct artificially inflated propane prices by February 1, 2004.

68. On or about February 5, 2004, during a conversation with Abbott, the BP Bench Leader [Radley] articulated the intent of the February 2004 TET trading strategy and the justification necessary for obtaining approval for the strategy:

> Two things I thought of. One, in terms of whether we should do this or not, in terms of talking to [BP Executive #1][Summers], what we stand to gain, is not just we'd make money out of it, but we would know from thereafter that **we can control the market at will**. If we never break the threshold, we'll never know what the answer is, you know what I mean?

(Emphasis supplied.) [Source: DPA ¶ 36.]

69. Members of the NGL Trading Bench intended to unjustly enrich BP by selling a portion of their February 2004 TET propane at the end of the month at prices inflated by their conduct, and then taking a small loss on the remaining barrels which would be carried into March. As such, the NGL Trading Bench recognized that they would purchase more propane than BP needed for its own business or commercial purposes, or could actively sell to counterparties during February. Furthermore, the NGL Trading Bench members could expect to profit personally by obtaining bonuses and other remuneration as a result of the anticipated profits BP would achieve through their market manipulation. [Source: DPA ¶ 38.]

### 3. Execution of the 2004 Scheme: Buy, Withhold, and Sell

#### a. The NGL Trading Bench's Attempt to Buy All Available Supply

70. Between on or about February 5 and February 9, 2004, Radley obtained approval from Summers for the conspirators to use BP funds to execute the scheme. [Source: 2007 Indictment ¶ 30.]

71. Thereby, Defendants were ratifying Radley's manipulative conduct which had been ongoing since January 2004.

72. Between on or about February 5, 2004 and on or about February 9, 2004, the BP Bench Leader [Radley] directed the execution of the manipulation scheme by instructing BP Trader # 1 [Claborn], Abbott, BP Trader #2 [Kienenberger], and BP Trader #3 [Morby] to buy a significant amount of February 2004 TET propane without arousing the suspicion of other market participants. [Source: DPA ¶ 39.]

73. By February 19, 2004, BP Employee # 4 [Summers], following his discussion of the market manipulation strategy with BP's Bench Leader [Radley], authorized the conspirators to use BP funds to reach a dominant long position concerning February 2004 TET propane. [Sources: Abbott Information ¶ 15(c); BP America Information ¶ 6(b); 2007 Indictment ¶ 30.]

74. Abbott and his conspirators, in accordance with their market manipulation strategy to become the dominant-long holder of February 2004 TET propane, engaged in the following specific trades, among others:

a. On February 9, 2004, Abbott purchased 25,000 barrels of February 2004 TET propane on behalf of BP at 0.615 cents per gallon;

b. On February 9, 2004, Abbott purchased 50,000 barrels of February 2004 TET propane on behalf of BP at 0.605 cents per gallon;

c. On February 9, 2004, Claborn [BP Trader #1] purchased 150,000 barrels of February 2004 TET propane on behalf of BP at 0.61 cents per gallon; and

d. On February 11, 2004, Abbott purchased 100,000 barrels of February 2004 TET propane on behalf of BP at 0.64 cents per gallon.

[Source: Abbott Information ¶ 15(d); BP America Information ¶ 6(d); 2007 Indictment ¶ 32.]

75. On the afternoon of February 9, 2004, the BP Bench Leader [Radley] spoke to BP Trader #1 [Claborn] and Abbott to check the progress of the scheme. During the conversation, the BP Bench Leader [Radley], BP Trader #1 [Claborn], and Abbott stated:

| | |
|---|---|
| BP Bench Leader: [Radley] | What's been going on? |
| BP Trader #1: [Claborn] | How much we got on? I was just looking at that, you wanna guess? 3.1 [million bbls]. |
| BP Bench Leader: [Radley] | Has it been busy today? |
| BP Trader #1: [Claborn] | Oh yeah. Did it very quietly. 10 lots, 5 lots, 10 lots, 15 here, 5 there. The biggest lot I think was 75. |

***

| | |
|---|---|
| BP Bench Leader: [Radley] | Did you feel good about it? |
| Abbott: | I kinda characterize it as . . . I characterize it as I was kinda surprised we were able to get 300 from the marketplace, basically, maybe 3-400 from the marketplace, without moving it that much. I mean we definitely were moving it [the price of TET propane] at the end of the day, it was definitely firming up at the end of the day . . . So it's kinda . . . it seems like something that will just kinda move fairly easily. |

[Source: DPA ¶ 40.]

76. Later, during the same telephone call on February 9, 2004, the same traders discussed the plan to continue to purchase large quantities of TET propane:

| | |
|---|---|
| Abbott: | I mean tomorrow, tomorrow if we are able to buy another 4-500 [thousand] barrels tomorrow from the marketplace, I would be genuinely shocked. I mean, really shocked so . . . that's it. Then I think . . . we'll just have to play a waiting game and see, you know, how it's gonna shape up. |

BP Bench Leader: [Radley] It, um, still remains to be seen, doesn't it? Still need to see some of these shorts come in . . . .

[Source: DPA ¶ 41.]

77. Finally, during the same February 9, 2004 telephone call, the traders identify the true nature of the scheme as one to "squeeze" other market participants:

BP Bench Leader: [Radley] Half of me is saying, look, the fact that nothing's really moved in terms of the spread yet is good, because people aren't looking for ways out . . . alternative feeds, or backing out demand, so that's kind of a good thing. The down side is, of course, if it all happens at the last minute, it gets a bit messy. People start cheating, not delivering, and may start to look a little bit funny as well that the spread, you know, just erupts at the last minute.

BP Trader #1: [Claborn] And we don't get the price out on all this paper [financial or "swap" contracts].

Abbott: Well, that's a different, thing, if we don't get a price out on all this paper.

BP Bench Leader: [Radley] The advantage of paper, is that we're selling at an index price there's no complaints. **If we squeeze it in the last four or five days of the month, ah, forgive my French, but ah, you know, it's going to be hard to say what's the fair price of the market at the time.**

(Emphasis supplied). [Source: DPA ¶ 42.]

78. Based on the activities of the BP Bench Leader [Radley], and BP Trader #1 [Claborn], Abbott, BP Trader #2 [Kienenberger], and BP Trader #3 [Morby], between the morning of February 9, 2004 and the close of business of February 13, 2004, the NGL Trading Bench purchased contracts for an additional 1.4 million barrels of February 2004 TET propane. As a result, at the close of business on February 13, 2004, the position of the NGL Trading Bench exceeded three million barrels of physical propane, in addition to a volume equivalent to

approximately 480,000 barrels in "paper" or financially settled propane contracts. [Source: DPA ¶ 43.]

79. The total TEPPCO system propane inventory fell slightly between February 9 and February 13, 2004, decreasing from just over 3.2 million barrels on February 9, 2004 to just over 3.1 million barrels on February 13, 2004. Therefore, as early as February 13, 2004, the agreements that Defendants had made in restraint of trade gave Defendants control of more physical TET propane than the entire TEPPCO system propane inventory.

80. As of February 13, 2004, the NGL Trading Bench estimated that BP's position then exceeded the volume of TET propane supply in the TEPPCO system. Additional waterborne imports or other sources could increase the supply, and delivery from the storage facility through the pipeline to end users could reduce supply during the month. Therefore, the NGL Trading Bench continued to monitor the TEPPCO inventory level. The traders on the NGL Trading Bench frequently discussed these inventory levels and also their estimates of the "dead stock" or minimum amount of propane needed for the pipeline to operate. [Source: DPA ¶ 44.]

81. As BP built its long position in February 2004 TET propane, the price of February 2004 TET propane rose steadily between February 9, 2004 and February 13, 2004.

82. On approximately February 15, 2004, factors unanticipated by the NGL Trading Bench caused the price of TET propane to decrease and the amount of available TET propane to increase. First, on February 15, 2004, the TEPPCO pipeline ruptured near Coschocton, Ohio, causing a suspension in the delivery of propane until the pipeline was repaired. The rupture caused the amount of propane stored in Mont Belvieu, Texas, to accumulate and decreased the amount of propane that could be delivered from the pipeline. [Source: DPA ¶ 45.]

83. Second, weather forecasts around February 15, 2004 changed and unexpectedly indicated warmer weather in the Northeast, reducing the demand and expected demand of TET propane. [Source: DPA ¶ 45.]

84. Third, on February 17, 2004, BP received a published report from Commercial Services Company, Ltd. which forecasted approximately 4.2 million barrels of propane destined for the United States *via* cargo ship in February 2004. This represented an increase in the amount of propane being imported into the United States. Combined, these factors put downward pressure on the price throughout the remainder of the month. [Source: DPA ¶ 45.]

85. The foregoing important changes in the fundamentals of the demand and the supply of TET propane caused an extraordinary, contra-seasonal change in TET propane inventories. Instead of continuing their normal decrease, those inventories contra-seasonally reversed course and began to increase. New propane supplies came into TEPPCO and less propane went out for heating.

86. Indeed, TET propane inventories increased to 3.4 million barrels on February 17, 2004, over 3.6 million barrels on February 20, over 4 million barrels on February 22, and over 4.1 million barrels on February 25. They stood at the end of February 2004 at 65% higher than average inventory over the prior five years.

87. Based on the supply-demand fundamentals of unexpectedly increased supplies and unexpectedly reduced demand, propane users should have enjoyed substantial declines in the prices of propane. TET propane, in particular, should have declined to 55¢ per gallon or lower.

88. However, Defendants' manipulative restraints of trade overwhelmed the supply-demand fundamentals. As is alleged in detail below, they did so by injecting sufficient artificial

demand to buy up the increased supplies, artificially withholding TEPPCO supplies, and deceiving the markets through multiple artifices, false statements, and deceptive conduct.

89. But for Defendants' unlawful agreements in restraint of trade and fraud and intentional boosting of propane prices, the prices of TET propane and other propane based on TET propane would have declined substantially to 55¢ per gallon or less.

90. Because the NGL Trading Bench had already purchased such a large quantity of February TET propane, by February 17, 2004, the NGL Trading Bench anticipated a significant loss of money if they began to unwind, or sell, their position at the prevailing price or if prices dropped further from the then-existing levels. The NGL Trading Bench accumulated even more TET propane. [Source: DPA ¶ 46.]

91. Between February l7, 2004 and February 20, 2004, the NGL Trading Bench purchased a substantial amount of additional contracts for more than 1.4 million barrels of physical February 2004 TET propane. By February 20, 2004, BP's position exceeded the TET propane in the TEPPCO system by approximately 1 million barrels. [Source: DPA ¶ 47.]

92. On February 25, 2004, BP employees purchased more than 600,000 barrels of February 2004 TET propane at prices between 85.25 cpg and 91.25 cpg. The OPIS average price for February 2004 TET propane increased to 89.25 cpg on February 25, an increase of 8.125 cpg over the same OPIS average price on February 24, 2004.

93. Between February 20 and February 29, 2004, the TEPPCO system propane inventory continued to increase. At various times during that period, BP's position in February TET propane also increased. During the last trading week of the month, BP's position reached approximately 5 million barrels of physical TET propane. From approximately February 17,

2004 through the last trading day of the month, February 27, 2004, BP's position exceeded the TEPPCO system inventory. [Source: DPA ¶ 48.]

### b. Selective Withholding of Supply

94. At certain times during late February, members of the NGL Trading Bench refused to sell physical TET propane to counterparties as part of their strategy to drive up the price. Acting at the direction of the BP Bench Leader [Radley], the traders at certain times refused to show offers or sell any of BP's TET propane, even though BP held contracts for delivery of millions of barrels, and in at least one instance a counterparty had offered "best bid." [Source: DPA ¶ 49.]

95. On or about February 20, 2004, Abbott refused to sell February 2004 TET propane to a counterparty because the conspirators wanted to withhold supply to artificially inflate the price. [Source: 2007 Indictment ¶ 41(a).]

96. On or about February 23, 2004, Radley directed the conspirators not to sell until they saw "the big shorts come in." [Source: 2007 Indictment ¶ 39; BP America Information ¶ 6(e).]

97. For example, on February 23, 2004, BP Trader #1 [Claborn] stated to a counterparty:

| | |
|---|---|
| Counterparty: | Can you use any Dynegy propane? |
| BP Trader #1: [Claborn] | Yea. |
| Counterparty: | Do you have any TET you can sell? |
| BP Trader #1: [Claborn] | Thought you were asking me about Dynegy. |
| Counterparty: | Well I am. I got a guy who wants to sell Dynegy and buy TET. Do you have any TET you can sell? |

BP Trader #1: [Claborn] — Not right now, I don't, but I'll take the Dynegy side.

At the time BP Trader #1 [Claborn] refused to sell, BP's position exceeded 4 million physical barrels. [Source: DPA ¶ 50; 2007 Indictment ¶ 41(b).]

98. Similarly, on February 26, 2004, BP Trader #2 [Kienenberger] stated to a counterparty:

Counterparty: I'm looking for 5,000 barrels of TET propane, didn't know if you guys were selling or not.

BP Trader #2: [Kienenberger] — No we're not right now, actually.

* * *

Counterparty: If you guys decided to come back in, I'm the best bid at five.

At the time of this conversation, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane. [Source: DPA ¶ 51; 2007 Indictment ¶ 41(c).]

99. On or about February 26, 2004, Radley directed the conspirators to refrain from selling propane to other market participants. [Source: 2007 Indictment ¶ 40.]

100. On February 24, 2004, BP employees executed an internal transaction "redesignating" three million barrels of February 2004 TET propane as March 2004 TET propane "wet" barrels. Abbott executed this internal transaction at the direction of management, noting:

> Rolling feb[ruary] length to WET March market. we will be carrying bbls [barrels] over to march *[sic]*

At the time, three million barrels of TET propane represented approximately 75% of the entire TEPPCO system propane inventory. Prior to this transaction, the NGL Bench had never executed an intra-month roll-over of one month's NGL barrels into a subsequent month.

101. On February 26, 2004, BP employees executed a second internal transaction "re-designating" 800,000 bbls of February 2004 TET propane as March 2004 "wet" barrels. Employee Kienenberger executed this internal transaction at the direction of management.

102. BP did not offer or sell physical barrels of propane on February 26, 2004, but continued to purchase even more TET propane during the day. [Source: DPA ¶ 52.]

### c. The NGL Trading Bench Sells at an Inflated Price

103. At the beginning of February 27, 2004, the last trading day of the month, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane. The NGL Trading Bench began the day by buying additional barrels of February TET propane before 9:00 a.m. from the remaining counterparties who still had barrels to sell. This meant that although BP already owned contracts far more than the deliverable supply of February TET propane on the last trading day of the month, they bought more in an effort to ensure that they would be the only company in the market that could sell significant quantities of TET propane. [Source: DPA ¶ 53.]

104. By mid-morning on February 27, 2004, the price for TET propane was not the result of legitimate forces of supply and demand, but was dictated by BP. Certain counterparties had no ability to bargain that day, but instead had to pay the prices set by BP:

| | |
|---|---|
| BP Trader #1: [Claborn] | [Company A] buys 25,000 at .89. |
| Voicebroker: | .89. Where's your next? .89 and a half? |
| BP Trader #1: [Claborn] | .89 and a half. |
| Voicebroker: | Alright. .89 and a half, next . . . are you just walking them up half step? |
| BP Trader # 1: | Now. |

[Claborn]

Voicebroker: For now you are?

BP Trader #1: [Claborn] Yes.

Voicebroker: 89 and half is next, his next offer is coming in penny higher.

[Source: DPA ¶ 54.]

105. Later in the morning on February 27, 2004, BP Trader #1 [Claborn] stated to a voicebroker:

Voicebroker: Hey, um, do you have an offer? I got .90 bid by [Company C].

BP Trader #1: [Claborn] Uh, .905.

Voicebroker: .905. Can you hang one second? [Talking on another line] . . . . .905, he's about to hang up.

BP Trader #1: [Claborn] No I'm not. Don't make me feel like the bad guy here.

Voicebroker: Would you do 50 [thousand barrels].

BP Trader #1: [Claborn] 50? I'll do 50.

Voicebroker: He'll do 50. [Company D]'s telling him to buy it because there's nobody else out here that has any but you. F***, what's it gonna go to [BP Trader #1][Claborn]? A buck?

BP Trader #1: [Claborn] Don't tell him you said that.

Voicebroker: I didn't tell him that.

***

BP Trader #1: Everything you say is recorded on all these lines.

[Claborn]

Voicebroker: I hear you.

[Source: DPA ¶ 55.]

106. Further, in addition to the telephone sales, on certain occasions BP was dictating the price of sales through the use of Chalkboard. During periods when there were relatively few sellers of February 2004 TET propane in the market, members of the NGL Trading Bench posted both bids and offers on Chalkboard. At regular intervals, and usually after a single transaction in the market occurred, the members of the NGL Trading Bench, often working in a coordinated fashion, would withdraw the bids and offers and increase both the bids and the offers, thereby effectively "stepping up the price." [Source: DPA ¶ 56.]

107. On February 27, 2004, a counterparty located in the Northern District of Illinois holding a short position in February TET propane was forced to buy from BP Products at an artificial and inflated price:

Counterparty: We just did a deal on Chalkboard, do you want 10 do another 5?

Abbott: Another five, hold on . . . we're at .925 for 5 [thousand bbls].

Counterparty: Holy smokes! Okay. What's going on? Just people like me out there trying to find this?

Abbott: Yeah.

Counterparty: Well crap, I may have to, I gotta do something here. .925 is it?

Abbott: Yep.

Counterparty: Jesus Christ, I don't have a choice do I? Not really?

Abbott: Not if you need to cover.

Counterparty: I need to cover, why don't we go ahead and do that.

[Source: DPA ¶ 57.]

108. Defendants, in order to profit from the scheme, engaged in the following sales of propane, among others, at inflated spot prices. On February 27, 2004 (a) BP Trader #1 [Claborn] sold to Company A, B and C 40,000, 10,000 and 25,000 barrels of February 2004 TET propane on behalf of BP at 0.94, 0.94 and 0.93 cents per gallon; and (b) Abbott sold to Company D 5,000 barrels of February 2004 TET propane on behalf of BP at 0.925 cents per gallon. [Source: 2007 Indictment ¶ 44; Abbott Information ¶ 15(n); *see* BP America Information ¶ 6(f).]

109. On or about February 27, 2004, Kienenberger offered to sell 10,000 barrels of February 2004 TET propane on behalf of BP on Chalkboard at 0.94 cents per gallon. [Source: 2007 Indictment ¶ 45.]

110. Defendants, in order to profit from the scheme, engaged in the following sales of February 2004 TET propane at artificially inflated prices based on the OPIS index: on or about February 24, 2004, Abbott and Claborn sold to Company E and Company F 30,000 barrels and 50,000 barrels of February 2004 TET propane, respectively, on behalf of BP at a price based on the OPIS daily average for February 24 through 27. [Source: 2007 Indictment ¶ 47.]

111. After selling concluded on February 27, 2004, the NGL Trading Bench had not sold enough to make a profit and had to take delivery of the remaining barrels at a significant loss. In an effort to mitigate these losses, in March 2004, the bench members refused to accept "late" deliveries and required counterparties that were "caught short" in their position from February to financially settle such contracts by paying the February 27 OPIS high price, which had been artificial and inflated by BP. [Source: DPA ¶ 58.]

112. By the end of the day, Defendants sold approximately 530,000 physical barrels of its accumulated February TET propane position. Defendants had to accept delivery of the remaining 4.4 million barrels and carry them into March at a significant loss.

113. On or about March 10, 2004, Claborn forced a counterparty that had been "caught short" in its position of 25,000 barrels from February to financially settle by paying 0.94 cents per gallon, the February 27 OPIS high spot price, which had been made artificial and inflated by the conspirators. [Source: 2007 Indictment ¶ 46.]

### 4. Additional Fraudulent Conduct to Support Scheme Throughout the Month

114. To execute the manipulation scheme, members of the NGL Trading Bench not only attempted to purchase all of the available February 2004 TET supply, but they also engaged in tactics to conceal their efforts, mislead counterparties, and otherwise manipulate the index price. [Source: DPA ¶ 59.]

115. Between February 9 and February 27, 2004, members of the NGL Trading Bench caused bids and offers to be presented to the market *via* Chalkboard which were designed to falsely reflect that there was more buying or selling interest in the market than actually existed. BP also engaged in conduct to affect the daily and monthly average price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price, from being reported. In the context of the market manipulation scheme, this conduct was intended to present false information to the market concerning the actual availability of TET propane, was intended to subvert the integrity of the industry benchmark average price, and was intended to defraud certain counterparties. [Source: DPA ¶ 60.]

116. Also, it was intended by Defendants to defraud the markets for propane and market participants.

117. On or about February 23, 2004, the conspirators discussed additional market "rumors" relating to BP trying to manipulate or squeeze the TET propane market, and the potential "reputational risk" that could befall BP and the conspirators as a result of the continuing scheme. [Source: 2007 Indictment ¶ 37.]

118. On or about February 23, 2004, Summers directed the conspirators to "go make money" on the manipulation strategy, concluding that the reputational risk was a "sunk cost" and to do otherwise would have resulted in a loss to BP. [Source: 2007 Indictment ¶ 38.]

119. On or about February 24, 2004, BP's Bench Leader [Radley] directed Abbott and BP Trader #1 [Claborn] to "defend the position" and continue to purchase February 2004 TET propane to achieve and maintain market dominance. [Source: Abbott Information ¶ 15(k).]

120. The conspirators engaged in the following purchases of February 2004 TET propane on behalf of BP during the last week of February to attempt to increase the price, despite the fact that BP had no commercial need for the propane, knowing that BP would carry the propane into March at a loss:

| **Date** | **Trader** | **Quantity (bbls)** | **Price (cpg)** |
|---|---|---:|---|
| 2/24/04 | Claborn | 25,000 | 0.7825 |
| 2/24/04 | Abbott | 25,000 | 0.75 |
| 2/25/04 | Kienenberger | 100,000 | 0.86 |
| 2/25/04 | Kienenberger | 50,000 | 0.855 |
| 2/25/04 | BP Trader #4 [Morby] | 20,000 | 0.90 |
| 2/26/04 | Abbott | 25,000 | 0.83 |
| 2/26/04 | Claborn | 25,000 | 0.84 |
| 2/27/04 | Claborn | 2,500 | 0.86 |

[Source: 2007 Indictment ¶¶ 36(a)-(h); Abbott Information ¶¶ 15(l) and (m).]

121. On February 24, 2004, Abbott sold 30,000 barrels to a counterparty. They agreed that the contract price for that propane was determined based on the OPIS daily average price for each subsequent trading day in February. The counterparty was not informed that BP was involved in posting "high floor" bids, "stacking" multiple offers and bids, "stepping up the price," posting deceptively low "wet" March offers, or withholding supply from the market during the three-day contract term. BP's conduct had the affect of manipulating the OPIS average price for each pricing day of that contract, and defrauded the counterparty who purchased TET propane based on the OPIS benchmark. [Source: DPA ¶ 61.]

122. Also, the markets for propane were not informed that Defendants were engaged in the foregoing conduct to inflate prices.

**5. Bidding During February 23 – 27 To Inflate Index Price and Manipulate Spot Price**

123. As alleged below, Defendants placed bids to “buy” propane on Chalkboard during the early mornings of on or about February 23 through on or about February 27, 2004, each of which was the “best bid” in the market at the time it was placed, and each of which was placed with the intent to: (a) push up or “step up” the February 2004 TET propane spot price; (b) force market participants to pay BP a price higher than where BP artificially set the bid; (c) deceive market participants about the demand for propane; and (d) permit BP to profit by selling propane based on the “OPIS average” price for that day, which average the conspirators sought to increase by placing such bids:

| Trader | Date | Time | BP Bid Price/gal |
|---|---|---|---|
| Abbott | 2/23/04 | 7:32:19 | 0.60 |
| BP Trader # 4 [Morby] | 2/23/04 | 7:33:03 | 0.62 |
| Abbott | 2/23/04 | 7:34:35 | 0.655 |
| BP Trader #4 [Morby] | 2/23/04 | 7:35:11 | 0.665 |
| Claborn | 2/23/04 | 7:44:37 | 0.675 |

| | | | |
|---|---|---|---|
| Claborn | 2/23/04 | 8:05:35 | 0.67625 |
| Claborn | 2/23/04 | 8:05:41 | 0.67625 |
| Claborn | 2/23/04 | 8:05:42 | 0.67875 |
| Claborn | 2/23/04 | 8:05:43 | 0.68 |
| Claborn | 2/23/04 | 8:05:44 | 0.68125 |
| Abbott | 2/24/04 | 7:57:36 | 0.72 |
| Abbott | 2/24/04 | 7:57:41 | 0.7225 |
| Abbott | 2/24/04 | 7:57:45 | 0.725 |
| Abbott | 2/24/04 | 7:57:50 | 0.7275 |
| Abbott | 2/24/04 | 7:58:16 | 0.73 |
| Claborn | 2/24/04 | 8:21:35 | 0.7225 |
| Claborn | 2/24/04 | 8:32:13 | 0.72375 |
| Claborn | 2/24/04 | 8:32:18 | 0.72625 |
| Claborn | 2/24/04 | 8:32:18 | 0.72625 |
| Claborn | 2/24/04 | 8:32:23 | 0.7275 |
| Claborn | 2/25/04 | 6:58:01 | 0.86 |
| Claborn | 2/26/04 | 6:59:10 | 0.85 |
| Claborn | 2/26/04 | 7:10:05 | 0.82125 |
| Kienenberger | 2/27/04 | 7:14:29 | 0.77625 |

[Source: 2007 Indictment ¶¶ 42(a)-(x).]

124. On or about February 25, 2004, Claborn purchased February 2004 TET propane from a counterparty and declined a discount offered to him unless the counterparty agreed not to report the price of the transaction to OPIS, because the discounted price would have constituted the OPIS low price for the day. [Source: 2007 Indictment ¶ 43.]

125. In certain transactions in which the NGL Trading Bench sold February 2004 TET propane using voice brokers, commission payments were made by counterparties using checks transmitted *via* the U.S. mail. In transactions in which the NGL Trading Bench sold February 2004 TET propane based on the OPIS index price, payments were wired by the counterparties from various states, including Texas and New York, to BP's account at Bank One, in Chicago, Illinois. [Source: DPA ¶ 62.]

### 6. Market Reaction and Industry Reports

126. Members of the NGL Trading Bench knew that counterparties and market observers were making allegations that someone was attempting a short squeeze, and that some suspected BP. BP Trader #1 [Claborn], Abbott, BP Trader #2 [Kienenberger], and BP Trader #3 [Morby] were each confronted by market participants with allegations that BP was involved in a "short squeeze." [Source: DPA ¶ 63.]

127. On February 23, 2004, OPIS published a newsletter that included the following:

> The gas liquids market is largely focused on the antics of Mt. Belvieu propane. Prices have held a strong tone as traders gossip about **the possibility that a short squeeze is being put in play in the TET market**. The short squeeze could be complicating the efforts of some to price inbound cargos of propane, traders add. Indeed, TET propane "anys" traded from 72-75.375cts/gal through the morning. Non-TET barrels were worked from 67-69.375cts/gal. In contrast, the Conway propane market has been quiet with confirmed deals holding a 61.25-61.75cts/gal range. Bushton barrels are thought to be trading at a 1-2cts/gal discount to Conway.

[Emphasis supplied.] [Source: DPA ¶ 64.]

128. On February 24, 2004, OPIS published a newsletter that included the following:

> In spot trading ... the talk in the propane markets is that one or more firms may be involved in a short squeeze in the TET propane market. Traders speculate that those firms own a hefty proportion of the inventories in TET storage and they are making sellers pay up for the right to cover. "Somebody's got to be getting killed," said one trader. "I hope nobody that owes me money." Traders marveled at the fact that TET propane opened at 74 cts/gal and ended the session at 88.25 cts/gal[.]

[Source: DPA ¶ 65.]

129. The total TEPPCO system propane inventory increased from 3.4 million barrels on February 17, 2004 to just over 3.6 million barrels on February 20, 2004.

130. Throughout this week, BP's position in February 2004 TET propane exceeded the entire TEPPCO system propane inventory, sometimes by as much as 1 million barrels. Some TET market participants recognized BP's trading behavior. For example, in a taped conversation

between Abbott and another market participant on February 18, 2004, the following exchange occurred:

participant: Jeez what is y'all's appetite for propane? I mean, it's just like feeding an elephant. You guys aren't really short though, are you? You just got stuff pricing out? You're short pricing or what?

Abbott: Um, yeah, we just like it.

participant: You dig it, huh?

Abbott: I'd call, ... I'd call it insatiable right now.

131. In another taped conversation between Claborn and another market participant, the following conversation took place on February 19, 2004:

participant: Cody Hunt?

Claborn: huh?

participant: Cody Hunt? Is that who this is?

///

Claborn: What are you talking about, man?

participant: Someone told me you that guys were trying to corner the TET market so I figured you were one of the Hunt Brothers.

Claborn: I think you are badly mistaken. . . .

### 7. BP Management's Participation In the Unlawful Conduct

132. Summers testified under oath that he brought Radley's description of the February 2004 TET propane strategy as a "squeeze" to the attention of Byers and Marz. He further testified that all three individuals -- Summers, Byers, and Marz -- reviewed the audiotape. Byers testified that Tim Bullock, the president of BP NAGP at that time, also became aware of Radley's description of BP's February 2004 TET propane strategy as a "squeeze."

133. During and after the execution of the manipulation scheme, members of the NGL Trading Bench provided certain information to various BP executives and the BP Compliance Manager [Marz]. Although the conduct violated BP's written policy, the BP Executives [Bullock, Byers and Summers] and Compliance Manager [Marz] failed to report this conduct to authorities, take affirmative steps to ensure such trading strategies did not recur, and chose not to discipline any of the traders, managers, or the compliance official involved until the Commodity Futures Trading Commission initiated an investigation. At no time during February 2004 did anyone at BP bring the scheme to the attention of the legal department. [Source: DPA ¶ 66.]

134. Initially, between February 5 and 9, 2004, the BP Bench Leader [Radley] provided BP Executive #1 [Summers] with certain information about the proposed strategy. [Source: DPA ¶ 67.]

135. On or about February 19, 2004, due to the large position of TET propane held by BP at that point, the possibility of BP losing money and the reputational risk to BP, Abbott, BP's Bench Leader [Radley] and BP Trader #1 [Claborn] agreed to seek continued management approval of their strategy. [Source: Abbott Information ¶ 15(g).]

136. On or about February 19, 2004, the BP Bench Leader [Radley] met with BP Executive #1 [Summers], BP Executive #2 [Byers], and the BP Compliance Manager [Marz]. At the time of the meeting, the TEPPCO pipeline had ruptured and the NGL Trading Bench had exceeded its position limit size imposed by BP policy. BP had accumulated contracts for over 4.5 million barrels of February TET propane, and the total available supply of propane in the TEPPCO storage facility was approximately 3.5 million barrels. After the February 19, 2004 meeting, the NGL Trading Bench continued to accumulate February TET propane. [Source: DPA ¶ 68.]

137. BP Employee ## 3 [Summers], 4 [Byers] and 5 [Marz] approved the continued execution of the strategy despite the consequential reputational risk to BP. [Source: Abbott Information ¶¶ 15(h)-(j).]

138. After the February strategy had concluded and the NGL Trading Bench anticipated that the loss associated with the strategy would be approximately $10 million, BP management instituted a business review of the trading strategy. [Source: DPA ¶ 69.]

139. In preparation for the business review, the BP Bench Leader [Radley] and BP Executive #1 [Summers] caused a PowerPoint presentation entitled "Lessons Learned" to be drafted. A purpose of the "Lessons Learned" PowerPoint presentation was to determine why BP lost money and how to make such a strategy profitable. One slide in the presentation compared BP's position in physical TET propane during February to the available supplies in the TEPPCO system, and clearly indicated that BP's position exceeded the available supply of propane by as early as February 11, 2004. The slide also indicated that BP continued to accumulate more propane after its position significantly exceeded the total TEPPCO inventory. Certain slides from the "Lessons Leaned" PowerPoint were presented, again, on or about March 26, 2004, and at high level management meetings on April 15 and July 28, 2004. [Source: DPA ¶ 70.]

140. Further, by at least May 5, 2004, BP Executive #3 [Chief Executive Officer or Business Unit Leader of BP's regional business unit, North America Gas & Power; an employee of BP International Services] and the BP Compliance Manager [Marz] became aware of the tape recorded conversation of the February 9, 2004 conversation in which the BP Bench Leader [Radley] used the word "squeeze" to describe the February trading activity to BP Trader #1 [Claborn] and Abbott. [Source: DPA ¶ 71.]

141. The conduct of the NGL Trading Bench was not self-reported to the authorities, nor was timely discipline imposed on any of the traders, managers, or the compliance official involved. In fact, BP initially informed members of the NGL Trading Bench that they would receive monetary bonuses at the end of the year. BP Executive #2 [Byers] also informed the NGL Trading Bench in early March 2004, despite the $10 million loss, that no trader would lose his or her job. Only after a regulatory inquiry commenced in 2005 was disciplinary action taken against certain individuals and other traders learned they would not receive their anticipated end of the year bonuses. [Source: DPA ¶ 72.]

## V. MONOPOLY POWER AND RELEVANT MARKET

142. (a) Defendants' unlawful agreements in restraint of trade to inflate prices constitute a *per se* violation of the antitrust laws of the Indirect Purchaser States as defined in ¶ 152.

(b) Defendants manipulative agreements in restraint of trade to inflate the prices of a necessity constitute a *per se* violation of the antitrust laws of the Indirect Purchaser States as defined in ¶ 152.

143. To the extent that the violations are not *per se* violations, the TEPPCO pipeline is a specialized pipeline for the transportation of propane. There are no alternatives to the TEPPCO pipeline for the transportation of propane out of the TEPPCO pipeline storage facility at Mont Belvieu, Texas. Moreover, only TET propane can be delivered on TET propane financial contracts.

144. Accordingly, the relevant market is the market for TET propane contracts calling for delivery in February 2004. Defendants held more than 50% of the long contracts in this market from February 1, 2004 forward. More importantly, Defendants exercised monopoly

power and/or market power from February 1, 2004 forward by virtue of the gross amount of Defendants' long position in TET propane contracts compared to the total supply of TET propane deliverable against such contracts.

145. Alternatively, the relevant market is propane in the TEPPCO Pipeline Service Area.[3] Because Mont Belvieu OPIS TET pricing was the benchmark index on which propane in the TEPPCO Pipeline Service Area and imports from Sarnia into Michigan were priced and sold, as a direct result of Defendants' manipulative conduct, the price of propane throughout the relevant market was artificially high throughout the Class Period.

146. By artificially inflating the prices in the relevant market by more than 1.5 times what fair and unmanipulated prices would have been, Defendants had a substantial deleterious effect on the commerce of each of the States under whose laws Plaintiffs and Class members seek recovery because the price increases in the relevant market were passed on to and otherwise inflated the prices of propane in such States.

## VI. EFFECTS ON INTERSTATE COMMERCE

147. Defendants conduct business throughout the United States, including the State of Illinois, and they have purposefully availed themselves of the laws of the States alleged in ¶ 152. Defendants' products are sold in the flow of interstate commerce and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

148. Defendants' unlawful conduct further substantially affected commerce in the States alleged in ¶ 152 herein. Among other things, Defendants caused the price for propane sold in those States to be artificially high during February and March 2004 because they, directly

[3] During the Class Period, the TEPPCO pipeline serviced an area that included the following States or portions thereof: Arkansas, Delaware, Southern Illinois, Southern Indiana, Kentucky, Southeastern Missouri, New Jersey, New York, Southern Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine.

and through their agents, engaged in activities affecting each such State. Defendants purposefully availed themselves of the laws of the States alleged in ¶ 152 herein in connection with their activities relating to the production and marketing of TET propane and/or non-TET propane. Defendants produced, promoted, sold, marketed and/or distributed TET propane and/or non-TET propane in each of the States alleged in ¶ 152 herein, thereby purposefully profiting from access to indirect purchasers in each such State. Defendants also contracted to supply or obtain goods or revenue related to the business for propane in each such State. As a result of the activities described herein, Defendants:

a. Caused tortious damage to the residents of the States identified herein;

b. Caused tortious damage in each of the States identified herein by acts or omissions committed outside each such State by regularly doing or soliciting business in each such State;

c. Engaged in persistent courses of conduct within each such State and/or derived substantial revenue from the marketing of TET propane and/or non-TET propane in each such State (and services relating to such marketing); and

d. Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in each such State while regularly doing or soliciting business in each such State, engaging in other persistent courses of conduct in each such State and/or deriving substantial revenue from the marketing of TET propane and/or non-TET propane in each such State.

149. The unlawful conduct alleged herein adversely affected every person who paid artificially high prices as a result of such unlawful conduct.

150. Without enforcing the antitrust and/or consumer protection laws of each of the States identified herein, companies that break the law will go unpunished. Defendants knew that commerce in each of the States identified herein would have to be adversely affected in order to implement their deception and manipulative restraint of trade or conspiracy.

a. The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Professor Herbert Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624.

b. Here, TET propane is not a component of what was sold to class members but is the same product. Once propane leaves the pipeline, it remains essentially unchanged as it moves through the distribution system. Thus, the TET propane price constitutes a substantial percentage of the individual Plaintiffs and class members' delivered price.

c. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in dependent variables are explained by changes in a multitude of variables – when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one component part in a product (or service) that is an assemblage of many parts. Thus, it is possible to isolate and identify only the impact of an increase of a component on the overall assembled product. Here, there is no assembly and a simple regression model may explain the effect of an artificial increase in TET propane prices on the prices paid by class members.

## VII. CLASS ACTION ALLEGATIONS

151. Plaintiffs bring this action as a Class action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of a Class consisting of: all persons or entities who purchased propane in the Consumer Protection States (defined below) or the Indirect Purchaser States (defined below) between February 1, 2004 to March 31, 2004 ("Class Period"). The Class excludes Defendants, any co-conspirators and their parents, subsidiaries, affiliates, officers, directors, and employees. Also excluded are any federal, state or local governmental entity, and any judge or judicial officer presiding over this matter, judicial staff and the members of their immediate families.[4]

152. For purposes of the Complaint and class definition, the "Indirect Purchaser States" are Arkansas, District of Columbia, Florida, Georgia, Maine, Michigan, Mississippi, New Jersey, New Mexico, New York, North Carolina, Tennessee, Vermont, West Virginia and Wisconsin. For purposes of the Complaint and class definition, the "Consumer Protection States" are Arkansas, Connecticut, Delaware, District of Columbia, Florida, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, West Virginia and Wisconsin.

153. The Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade and commerce involved, the members of the Class are geographically dispersed within the Consumer Protection States and the Indirect Purchaser States. While the exact number of the members of the Class is unknown to Plaintiffs at this time, Plaintiffs believe,

---

[4] Plaintiffs reserve the right to amend the class definition to add additional subclasses and additional plaintiffs at the time of the motion for class certification.

based on the sales volume of propane, that there are hundreds of thousands or more members of the Class.

154. Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. Defendants' unlawful conduct affected all members of the Class in a similar manner, *i.e.*, they overpaid for propane. Plaintiffs and members of the Class they seek to represent have all sustained damages arising out of Defendants' conduct in violation of the Consumer Protection States' and Indirect Purchaser States' laws, as complained of herein.

155. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants intended to and did make agreements in restraint of trade to inflate propane prices, including TET propane prices;

b. Whether Defendants intended to and did engage in deceptive conduct to inflate propane prices, including TET propane prices;

c. The duration and amount of Defendants' unlawful inflation of propane prices, including TET propane prices;

d. Whether the alleged conduct violated the Indirect Purchaser States' laws concerning antitrust as alleged in Count I of this Complaint;

e. Whether the alleged conduct violated the Consumer Protection States' laws as alleged in Count II herein;

f. Whether Defendants unjustly enriched themselves and, if so, to what extent;

g. Whether Defendants are liable for unjust enrichment under the laws of the States alleged in ¶ 152;

h. The amount by which Defendants' unlawful conduct has inflated the prices paid by members of the Class for propane gas, including TET propane gas, over the amounts they would have paid in a competitive market unaffected by Defendants' illegal acts; and

i. Whether Defendants' conduct caused injury to Plaintiffs and the Class members they seeks to represent and, if so, the proper measure of damages.

156. Plaintiffs' claims are typical of those of the Class because Plaintiffs and Class members were injured in paying artificially high prices caused by Defendants' self-same course of unlawful conduct.

157. Plaintiffs will fully and adequately protect the interests of all members of the Class. Plaintiffs have retained counsel experienced in class action and antitrust litigation. Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

158. The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

159. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

160. The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and

prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual class members may be relatively small and therefore the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## AS AND FOR A FIRST CLAIM FOR AGREEMENTS IN RESTRAINT OF TRADE, MANIPULATIVE RESTRAINTS OF TRADE AND MONOPOLY

161. Plaintiffs repeat and reincorporate the previous allegations as if fully set forth herein.

162. Defendants made agreements in restraint of trade and manipulatively restrained trade in order to inflate prices. Defendants acquired a monopoly, engaged in commodity cornering or engrossing, and manipulatively boosted prices.

163. One nexus between Defendants' unlawful conduct in each of the Indirect Purchaser States alleged in ¶ 152 is that such conduct artificially inflated and manipulated the prices of propane used during the relevant period in such States. Defendants' unlawful conduct substantially affected trade and/or commerce in each of the Indirect Purchaser States alleged in ¶ 152. Plaintiffs and class members' injury are fairly traceable to Defendants' unlawful conduct and are likely to be redressed by the relief requested herein.

164. Defendants specifically intended their foregoing conduct to inflate propane prices. Such conduct did have the effect of inflating propane prices, unreasonably restraining trade, and proximately causing injury to Plaintiffs and Class members in each of the Indirect Purchaser States alleged in ¶ 152.

165. Defendants' foregoing conduct violated the common law prohibitions against restraints of trade, monopoly and anticompetitive activities of the State of New York and each of

the following States, as well as in the following specifically alleged sections and related sections of such laws of such States:

a. Arkansas Stat. Ann. §§ 4-75-201, *et seq.*

b. District of Columbia Code §§ 28-4501, *et seq.*

c. Florida Statutes §§ 542.15, *et seq.*

d. Georgia Code Ann. §§ 13-8-2, *et seq.*

e. Maine Revised Statutes, Title 10 § 1101, *et seq.*

f. Michigan Compiled Laws §§ 445.773, *et seq.*

g. Mississippi Code §§ 75-21-1, *et seq.*

h. New Jersey Statutes § 56:9-4, *et seq.*

i. New Mexico Statutes §§ 57-1-1, *et seq.*

j. North Carolina General Statutes §§ 75-1, *et seq.*

k. Tennessee Code §§ 47-25-101, *et seq.*

l. Vermont Statutes, Title 9 §§ 2453, *et seq.*

m. West Virginia Code §§ 47-18-1, *et seq.*

n. Wisconsin Statutes §§ 133.01, *et seq.*

166. As a foreseeable and proximate result of Defendants' unlawful conduct in violation of each of the foregoing State's laws, Plaintiffs and Class members in those States were injured in that they paid artificially inflated prices for propane.

**AS AND FOR A SECOND CLAIM**
**FOR VIOLATION OF COMMON LAW FRAUD AND**
**CONSUMER PROTECTION STATUTES**

167. Plaintiffs repeat and reincorporate the previous allegations as if fully set forth herein.

168. It was essential to Defendants' manipulation that they engage in fraudulent and deceptive conduct, and Defendants did so.

169. Defendants' conduct constitutes artifices, price boosting, and deception.

170. Defendants' conduct constitutes unconscionable, fraudulent, deceptive, misleading, gross, oppressive, aggravated or unfair acts, practices or conduct in violation of the consumer protection and unfair competition statutes specified below.

171. The artificially inflated and manipulated prices of propane during the relevant period caused by Defendants' unlawful conduct had the effect of deceiving Plaintiffs. Defendants' unlawful conduct and deception includes many material misrepresentations as previously alleged.

172. Defendants specifically intended their artifices, deception, price boosting, unfair and unconscionable conduct, and fraud to artificially inflate propane prices.

173. In the circumstances alleged here, Plaintiffs and Class Members disclaim any need to establish reliance. To the extent that reliance may be required to be shown, various third parties relied upon Defendants' deceit and fraud. These third parties include but are not limited to the market for TET propane. Further, Plaintiffs and Class Members did rely on the deceptive price boosting in that they paid the artificially inflated prices which Defendants' fraudulent price boosting scheme caused. This pocket book reliance establishes a direct causal connection between Defendants' price-boosting fraudulent scheme and Class Members injuries and damages.

174. In paying for propane, each Plaintiff and Class Member suffered "pocket book reliance" of the omission of the material fact that propane prices were rigged and of all the other fraudulent acts pleaded in this Complaint. Further, third parties relied on the fraudulent acts and

their reliance, as Defendants intended, inflated propane prices and caused damages to Plaintiffs and Class Members. Finally, reliance was compelled by the circumstances alleged herein, including the fact that propane is a necessity for heating in winter.

175. In these circumstances, Defendants conduct violates the common law prohibition against fraud of each of the following States as well as the consumer protection laws for such States in the following specifically alleged sections and related sections of such laws:

a. Arkansas Code §§ 4-88-101, *et seq.*

b. Connecticut General Statutes §§ 6-1-101, *et seq.* and §§ 42-110q, *et seq.*

c. Delaware Code Ann. Title 6 §§ 2511, *et seq.*

d. District of Columbia Code § 28-3901, *et seq.*

e. Florida Statutes §§ 501.201, *et seq.*

f. Illinois Compiled Statutes §§ 815 ILCS 505, *et seq.* and §§ 815 ILCS 510, *et seq.*

g. Indiana Code §§ 27-4-1, *et seq.*

h. Kentucky Revised Stat. Ann. §§ 367.110, *et seq.* and §§ 365.020, *et seq.*

i. Louisiana Revised Statutes §§ 51:1401, *et seq.*

j. Maine Revised Statutes, Title 5 §§ 207, *et seq.*

k. Maryland Code Ann., Com. Law §§ 13-101, *et seq.*

l. Massachusetts Gen. Laws Ch. 93A §§ 1, *et seq.*

m. Michigan Compiled Laws §§ 445.901, *et seq.*

n. Missouri Revised Stat. §§ 407.010, *et seq.*

o. Mississippi Code Ann. §§ 75-24-15, *et seq.*

p. New Hampshire Revised Statutes §§ 358-A:1, *et seq.*

q. New Jersey Statutes Ann. §§ 56:8-1, *et seq.*

r. New Mexico Statutes §§ 57-12-1, *et seq.*

s. New York General Business Law §§ 349, *et seq.*

t. North Carolina General Statutes §§ 75-1.1, *et seq.*

u. Ohio Revised Code Ann. §§ 1345.01, *et seq.*

v. Pennsylvania Statutes §§ 73 P.S. 201-1, *et seq.*

w. Rhode Island Gen. Laws. §§ 6-13.1-1, *et seq.*

x. South Carolina §§ 439-5-20, *et seq.*

y. Tennessee Code Ann. §§ 47-18-101, *et seq.*

z. Texas Bus. & Com. Code Ann. §§ 17.41, *et seq.*

aa. Vermont Statutes, Title 9 §§ 2451, *et seq.*

bb. Virginia Code Ann. §§ 59.1-196, *et seq.*

cc. West Virginia Code §§ 46A-6-101, *et seq.*

dd. Wisconsin Statutes §§ 100.20, *et seq.*

176. As a foreseeable and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members in those States suffered injury, damages, and specific losses in that they had to pay artificially inflated prices for propane.

177. Defendants' conduct offends public policy and is unfair and involves practices which are immoral, unethical, oppressive, unscrupulous and unconscionable. Accordingly, Plaintiffs and Class Members, except for those claiming under the laws of the States of Arkansas, Connecticut, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, New Jersey, New York, Ohio and Tennessee (and any other State as to which punitive damages would impair class action treatment), request that awarded punitive and exemplary damages be awarded and distributed in proportion to actual damages.

**AS AND FOR A THIRD CLAIM**
**FOR UNJUST ENRICHMENT**

178. Plaintiffs repeat and reincorporate the previous allegations as if fully set forth herein.

179. Defendants' unlawful and deceptive conduct unjustly enriched Defendants in violation of the federal common law as well as the common and statutory laws of the following States: Alabama, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, West Virginia and Wisconsin.

180. Because of the overpayments by Plaintiffs and class members, the benefits to Defendants' operations of higher propane prices, and all the circumstances, it would be inequitable not to compensate Plaintiffs and class members.

181. This unjust enrichment should be disgorged and paid to Plaintiffs and Class Members.

WHEREFORE, Plaintiffs and the Class request as follows:

(a) that this Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) that this Court declare, adjudge, and decree that Defendants have committed violations of State laws alleged herein;

(c) that this Court award Plaintiffs and the Class their damages caused by Defendants' violations plus appropriate statutory enhancements including trebling;

(d) that this Court impress a trust on the Defendants' unjust enrichment and award Plaintiffs and the Class, and further award Plaintiffs and Class Members restitution in the amount of the overcharges they paid;

(e) that this Court grant Plaintiffs and the Class the actual costs in prosecuting this action together with interest and statutory or other attorneys' fees and costs;

(f) that, as to States other than the States of Arkansas, Connecticut, Florida, Illinois, Louisiana, Maryland, Massachusetts, Missouri, New Jersey, New York, Ohio and Tennessee (and any other State as to which punitive damages would impair class action treatment), this Court award punitive and exemplary damages against Defendants; and

(g) that this Court grant such further and other relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury on those claims where such trial is permitted and request an advisory jury on those claims where jury trial is not permitted.

Dated: Chicago, Illinois
April 4, 2008

**LOVELL STEWART HALEBIAN LLP**

**By** __/s/ Christopher Lovell__________
Christopher Lovell, Esq.
Gary S. Jacobson, Esq.
Ian T. Stoll, Esq.
Imtiaz Siddiqui, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 608-1900

**FUTTERMAN HOWARD WATKINS WYLIE & ASHLEY, CHTD.**

**By** __/s/ John R. Wylie__________

Ronald Futterman, Esq.
John R. Wylie, Esq.
122 South Michigan Ave., Suite 1850
Chicago, Illinois 60603
(312) 427-3600

**KIRBY McINERNEY LLP**

**By** __/s/ Daniel Hume________

Daniel Hume, Esq.
David Kovel, Esq.
830 Third Avenue
New York, New York 10022
(212) 371 6600

**WEXLER TORISEVA WALLACE LLP**

**By** __/s/ Kenneth A. Wexler______
Kenneth A. Wexler, Esq.
Edward A. Wallace, Esq.
One North LaSalle Street
Suite 2000
Chicago, Illinois 60602
(312) 346-2222

**MILLER LAW LLC**

**By** _/s/ Marvin A. Miller__________
Marvin A. Miller, Esq.
115 South LaSalle Street
Suite 2910
Chicago Illinois 60603
(312) 332-3400

**Interim Co-Lead Counsel For Plaintiffs And The Class**

**ARONOVITZ TRIAL LAWYERS**
Tod Aronovitz, Esq.
Steven R. Jaffe, Esq.
Museum Tower
Suite 2700
150 West Flagler Street
Miami, Florida 33130
(305) 372-2272

**LARRY D. DRURY, LTD.**
Larry D. Drury, Esq.
205 West Randolph
Suite 1430
Chicago, Illinois 60606
(312) 346-7950

**EMANUEL & DUNN, PLLC**
Stephen A. Dunn, Esq.
130 South Salisbury Street
Raleigh, NC 27601
(919) 832-0329

**FEDERMAN & SHERWOOD**
William B. Federman, Esq.
10205 N. Pennsylvania
Oklahoma City, Oklahoma 73120
(405) 235-1560

**FREED & WEISS LLC**
Paul M. Weiss, Esq.
William M. Sweetnam, Esq.
111 West Washington Street
Suite 1331
Chicago, Illinois 60602
(312) 220-0000

**GARDY & NOTIS, LLP**
Mark Gardy, Esq.
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ 07632
(201) 567-7377

**GUSTAFSON & GLUEK PLLC**
Daniel Gustafson, Esq.
Jason Kilene, Esq.
725 Northstar East
608 Second Avenue South
Minneapolis, Minnesota 55402
(612) 333-8844

**HARKE & CLASBY LLP**
Lance A. Harke, Esq.
155 South Miami Avenue, Suite 600
Miami, FL 33130
(305) 536-8222

**WILLIAM J. HARTE, LTD.**
William J. Harte, Esq.
111 West Washington Street, Suite 1100
Chicago, IL 60602
(312) 726-5015

**JOHNSON & PERKINSON**
Dennis Johnson, Esq.
James F. Conway, III, Esq.
1690 Williston Road
P.O. Box 2305
South Burlington, Vermont 05403
(802) 862-0030

**KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman, Esq.
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
(845) 356-2570

**ROBERT M. KLEIN. ESQ.**
239 South Fifth Street, 17th Floor
Louisville, KY 40202
(502) 581-1600

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge, Esq.
W. Joseph Bruckner, Esq.
Jason Kilene, Esq.
100 Washington Avenue South
Suite 2200
Minneapolis, Minnesota 55401
(612) 224-3833

**MAGER & GOLDSTEIN LLP**
Jayne Goldstein, Esq.
2825 University Drive, Suite 350
Coral Springs, Florida 33065
(954) 341-0844

**MCEWEN LAW FIRM P.L.L.C**
Greg McEwen, Esq.
5850 Blackshire Path
Inver Grove Heights, Minnesota 55076
(651) 224-3883

**Attorneys for Additional Plaintiffs**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE<br>BP PROPANE INDIRECT PURCHASER<br>ANTITRUST LITIGATION | ) | No. 06-cv-3541<br>Honorable James V. Zagel |

**CERTIFICATE OF SERVICE**

John Wiley, pursuant to 28 U.S.C. Section 1746, declares:

I am not a party to this action, am over eighteen years of age, and am counsel for plaintiffs in the above captioned matter. On April 4, 2008, I caused to be served plaintiffs *Consolidated Complaint And Demand For Trial By Jury*, electronically via the Court's ECF system, upon:

Kevin Michael Flynn; Kevin@kmflynnlaw.com
Kevin M. Flynn & Associates
77 West Wacker Drive
Suite 4800
Chicago, IL 60601-1664
*Attorneys for defendant Cody Claborn*

Richard Cartier Godfrey; rgodfrey@kirkland.com
David J. Zott; dzott@kirkland.com
Andrew A. Kassof; akassof@kirkland.com
Matthew S. Meltzer; mmeltzer@kirkland.com
Kathryn Frances Taylor
Kirkland & Ellis LLP (Chicago)
200 East Randolph Drive
Suite 6100
Chicago, IL 60601
*Attorneys for defendant BP Products North America, Inc.*

Ryan K. Higgins; rhiggins@rustyhardin.com
Rusty Hardin and Associates
1401 McKinney
Suite 2250
Houston, TX 77010
*Attorneys for defendant Cody Claborn*

Monte Moren Mann
Novack and Macey LLP
100 North Riverside Plaza
Suite 1500
Chicago, IL 60606
*Attorneys for defendant Mark Radley*

Patrick Edward Cafferty; pcafferty@caffertyfaucher.com
Jennifer Winter Sprengel; jsprengel@caffertyfaucher.com
Cafferty Faucher LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602
*Attorneys for plaintiff Schagringas Co.*

William Henry London; wlondon@fklmlaw.com
Freed Kanner London & Millen, LLC
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
*Attorneys for plaintiff Schagringas Co.*

Marvin Alan Miller; Mmiller@millerlawllc.com
Matthew E Van Tine; mvantine@millerlawllc.com
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
*Attorneys for plaintiff Schagringas Co.*

Sharon Harris
Barnow & Associates, PC
One North LaSalle Street
Suite 4600
Chicago, IL 60602
*Attorneys for plaintiff Parke J Patten, Inc.*

Kenneth A Wexler; kaw@wtwlaw.us
Edward Anthony Wallace
Amber Margaret Nesbitt
Wexler Toriseva Wallace LLP
55 West Monroe
Suite 3300
Chicago, IL 60603
*Attorneys for plaintiffs Donald Terry & Jennifer Terry*

William Michaelangelo Sweetnam
Paul M. Weiss; paul@freedweiss.com
Drew Halpern
H Steven Plaut
Kurt Nebel
Freed & Weiss LLC
111 W. Washington St.
Suite 1331
Chicago, IL 60602
*Attorneys for plaintiff David A Mullins III*

and via First Class mail, by inserting a true and correct copy in a properly addressed, postage paid envelope and delivering to a depository under the care and control of the United States Post Office, upon:

Glenn R. Reichardt
Kirkpatrick & Lackhart Nicholson Graham LLP
1601 K Street, NW
Washington, DC 942060
(202) 778-9065
*Attorneys for defendant Mark Radley*

Marsha Montgomery
501 Westlake Park Blvd.
Houston, TX 77079
*Attorney for defendants BP America Production Co., BP America, Inc., BP Corp. of North America, Inc., BP Energy Co., BP International Services Co.*

Michael L Spafford
McKee Nelson LLP
1919 M. Street NW
Suite 200
Washington, D.C. 20036
*Attorneys for defendant Dennis Abbott*

Neil W Eggleston
Debevoise & Plimpton LLP
555 West 13th Street NW
Suite 1100 East
Washington, D.C. 20004
*Attorneys for defendant Donald Cameron Byers*

Gregg L Bernstein
Zuckerman Spaeder LLP
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
*Attorneys for defendant James Summers*

Stuart M Altman; smaltman@hhlaw.com
Hogan & Hartson LLP
555 13th Street NW
Washington, D.C. 20004
*Attorneys for defendant Martin Marz*

Jerrob Duffy; jerrob.duffy@usdoj.gov
US Dept. of Justice
Fraud Section
950 Pennsylvania Avenue
Washington, DC 20530
*Attorneys for intervenor US Department of Justice*

Tyler C Murray; tyler.c.murray@usdoj.gov
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
*Attorneys for intervenor US Department of Justice*

Karen L. Morris; kmorris@morrisandmorrislaw.com
Patrick F Morris
Morris and Morris LLC
4001 Kennett Pike
Suite 300
Wilmington, DE 19807
*Attorneys for plaintiff Schagringas Co.*

Thomas A. Tucker Ronzetti; TR@kttlaw.com
Kozyak Tropin & Throckmorton
2525 Ponce de Leon Boulevard
9th Floor
Miami, FL 33134
*Attorneys for plaintiff Schagringas Co.*

David H. Weinstein; Weinstein@wka-law.com
Weinstein, Kitchenoff, Scarlato &
1845 Walnut Street
Suite 1000
Philadelphia, PA 19103
*Attorneys for plaintiff Styer Propane LLC*

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 4, 2008.

_________/s/_________________
John Wiley